BENDER, (UNITED STATES v.) See Case No. 14,567.

---

# Case No. 1,292.

### Ex parte BENEDICT.

[4 West. Law Month. 449.]

District Court, N. D. New York. Sept. 30, 1862.

HABEAS CORPUS — RETURN — DISCHARGE OF PRISONER — POWER OF JUDGE AT CHAMBERS — PRISONER BEYOND JURISDICTION — DISOBEDIENCE OF MARSHAL—PUNISHMENT FOR CONTEMPT—POWER OF COURT.

1. The construction and effect of the two orders of the war department, of the 8th of August, 1862, relative to the arrest of disloyal persons and of persons liable to draft, about to leave the United States, considered and discussed.

[Cited in Ex parte Field, Case No. 4,761.]

2. The president of the United States is not vested by the constitution of the United States with power to suspend the privilege of the writ of habeas corpus, at any time, without the authority of an act of congress.

[Distinguished in Ex parte Field, Case No. 4,761. See Ex parte Milligan, 4 Wall. (71 U. S.) 2.]

[3. A statement by a United States marshal, on the return to a writ of habeas corpus, that he had disobeyed the writ, and deported the prisoner in accordance with instructions from the secretary of war, is a sufficient return.]

[4. At common law a judge at chambers has no power ·to order the discharge of a prisoner on habeas corpus.]

[5. Where the prisoner is beyond the jurisdiction, and an order for his discharge on habeas corpus would be ineffectual, it should not be granted.]

[6. As the marshal would have been exposed to injurious consequences for disobedience to the order of the secretary, he should not be punished for contempt of court when it appears that he can be punished criminally under the state laws, and that the prisoner has an adequate civil remedy against him.]

[7. Section 28 of the judiciary act, providing that, in all cases wherein the marshal is a party, the writs and precepts therein shall be directed to a disinterested person, who shall execute the same, is not applicable to an attachment against the marshal for a contempt.]

[8. Consequently, as process committing the marshal for a contempt would run to him in his official capacity, the issue of such process will be refused as impracticable.]

[On habeas corpus. Application for the discharge of Judson D. Benedict from the custody of Edward I. Chase, United States marshal. The prisoner being without the jurisdiction at the time of the return to the writ, the court declined to order his discharge from custody. An application was also made to punish the marshal for contempt in disobeying the writ. Application refused.]

HALL, District Judge. The application for the writ of habeas corpus, in this case, was made while I was engaged in other duties; and although I retained the petition and gave the questions presented a hasty examination, before I allowed the writ, I had no time to prepare an opinion upon the questions..which then occurred to me as necessary to be considered before granting the petitioner's application. I .therefore simply made a note of the authorities examined; and, as the case is one of importance, I shall now state my opinion upon the questions considered at the time the petition for the habeas corpus was under consideration; and refer to the authorities then examined, and some others, which appear to me to require the exercise of the jurisdiction and authority invoked by the petitioner.

The act of congress of September 24, 1789, [1 Stat. 81, § 14,] the judiciary act, declares that either of the justices of the supreme court, as well as judges of the district courts, shall have power to grant writs ·of habeas corpus for the purpose of an inquiry into the cause of commitment: provided, that writs of habeas corpus shall in no case extend to prisoners in gaol, unless where they are in custody, under or by color of the authority of the United States, or are committed. for trial before some court of the same, or are necessary to be brought into court to testify. It appears by the petition and affidavits annexed, that the petitioner is confined in gaol, and the only cause of his detention rendered by the gaoler, is a paper delivered to him by A. G. Stevens. deputy U. S. marshal, of which the following is a copy:

"Marshal's Office, Buffalo. September 2d, 1862. David M. Grant will take from Fort Porter, Thomas Commings, James Parker, Antoine Quantent, Noah B. Clark and Jared Benedict, prisoners confined there, committed under orders of the war department, and remove them to the Erie county jail for safe keeping, and there detain them until further order; and the sheriff or jailer of said county will keep them until further order, in said jail. (Signed) A. G. Stevens, U. S. Dep. Marshal. To Col. E. P. Chapin, and the sheriff and jailer of Erie county."

From this it clearly appears that the petitioner is in custody by color of the authority of the United States, either under the orders of the war department, or of the deputy marshal, who is an officer, deriving his authority as such, from the United States. The petition further shows that when the deputy marshal was applied to by the counsel for the petitioner, and asked "if he arrested the petitioner by virtue of any order, process or paper," that officer said he did not, but showed the counsel a slip cut from a newspaper, purporting to contain a copy of an order of the war department, in the following words:

"War Department, Washington. August 8th, 1862. Ordered: First—That all United States marshals and superintendents, and chiefs of police, of any town, city or district, be and they are hereby authorized and directed to arrest and imprison any person or persons who may be engaged, by act, speech, or writing, in discouraging volunteer enlistments, or in way giving aid and comfort to the enemy, or in any other disloyal practice against the United States. Second—That immediate report be made to Major L. C. Turner, judge advocate, in order that such persons may be tried before a military commission. Third—That the expenses of such arrest and imprisonment will be certified to the chief clerk of the war department, for settlement and payment. (Signed) Edwin M. Stanton, Sec'ry of War."

The affidavit of the counsel also states that the deputy marshal, at the same time, said "that printed slip was his only authority for the arrest of said Benedict."

The petitioner states in his petition that he "is not committed or detained by virtue of any process issued by any court of the United States, or any judge thereof, or by virtue of the final judgment, or decree of any court, or by virtue of any process of any kind or description; that he has neither by act or speech been disloyal to the constitution or laws of the United States, or been guilty of any violation of any order of the war department, or of the president of the United States, or been guilty of any offence or act subjecting him to arrest;" and this petition is verified by the oath of the petitioner. On the case thus made by the pe-

titioner, I should have granted a habeas corpus at once, on the first reading of his petition and the accompanying affidavits, had I not seen a newspaper copy of an order of the war department assuming to suspend, in certain cases, the privileges of the writ of habeas corpus. This order bears the same date as that referred to by the deputy marshal, and is in the following words:

•"War Department, Washington. August 8th, 1862. Order to prevent evasion of military duty and for suppression of disloyal practices. First—By direction of the president of the United States it is hereby ordered that until further order, no citizen liable to be drafted into the militia shall be allowed to go to a foreign country, and all marshals, deputy marshals, and military officers of the United States, are directed, and all police authorities, especially at the ports of the United States on the seaboard and on the frontier, are requested to see that this order is faithfully carried into effect. And they are hereby authorized and directed to arrest and detain any person or persons about to depart from the United States, in violation of this order, and report to L. C. Turner, judge advocate, at Washington city, for further instructions respecting the person or persons so arrested or detained. Second—Any person liable to draft, who shall absent himself from his county or state, before such draft is made, will be arrested by any provost marshal, or other United States or state officer, wherever he may be found within the jurisdiction of the United States, and conveyed to the nearest military post or depot, and placed on military duty for the term of the draft; and the expenses of his own arrest and conveyance to such post or depot, and also the sum of five dollars as a reward to the officer who shall make such arrest, shall be deducted from his pay. Third—The writ of habeas corpus is hereby suspended in respect to all prisoners so arrested and detained, and in respect to all persons arrested for disloyal practices. (Signed) Edwin M. Stanton, Sec'ry of War."

The two orders of the war department, bearing the same date, may properly be considered together, and as relating to the same general subject. Whether issued separately or together, whether, if issued separately, the one referred to by the deputy marshal was first issued or not, it may not be very material to inquire; but, as that declares that "all United States marshals, and superintendents, and chiefs of police of any town, city or district, be and they are hereby authorized and directed to arrest and imprison any person or persons who may be engaged, by act, speech or writing, in discouraging volunteer enlistments, or in any way giving aid and comfort to the enemy, or in any other disloyal practice against the United States," and the other order assumes to suspend the writ of habeas corpus in respect not only to all persons arrested and detained by virtue thereof, but

3FED.CAS.—11

also "in respect to all persons arrested for disloyal practices," (a term not otherwise contained in the order,) it may be presumed that the order referred to by the deputy marshal was first issued, and that the other order was intended to suspend the writ of habeas corpus in respect to persons arrested under that order, or under the order referred to by the deputy marshal. If the order declaring the writ of habeas corpus to be suspended can be considered as legal and valid, it is necessary to consider its scope and effect, and, as both questions are therefore properly before me, I shall consider both in their order. It is to be observed that the first order cited, confines the power of arrest to United States marshals, and superintendents, and chiefs of police, while the second order, in respect to the cases within it, extends the power to all deputy marshals and all military officers of the United States, and to all police authorities. These officers, many thousands in number, and of every grade of intelligence, are scattered over every portion of our country. To all of these arbitrary powers of arrest, without warrant, and without any prior legal inquiry, and without the slightest preliminary proof of guilt, is assumed to be given. Was it intended, then, that every policeman and every military officer throughout the loyal states, and in localities far removed from the seat of military operations, should be authorized to arrest and imprison any citizen, and that if, on taking the party into custody, or afterwards, such officer should declare that he made the arrest by virtue of the orders of the war department of August 8, 1862, or for disloyal practices, he could keep him in prison, or in his own custody, or compel him to enter the military service, and also require all judicial officers, when the prisoner or his friends applied for a writ of habeas corpus, that the facts of the case might be judicially ascertained and the question of the legality of his arrest and detention considered, to say, "The privilege of the writ of habeas corpus is suspended, and you can have no relief?" Is every man supposed to be subject to militia duty, who has left or shall leave his county since the 8th of August last, and prior to the unknown day in the future when a draft is to be made, no matter under what circumstances, to be punished by being forced into the military service for nine months, without any hearing, without any opportunity to show that he is exempt from militia duty, when the constitution provides that "no person shall be deprived of life, liberty or property, without due process of law?" I am aware that these restraints upon travel have been removed, but was that the original intention of the order?

My personal confidence in the integrity, patriotism, and good sense of the president, as well as the respect due to the high office he holds, compels me to require the most conclusive evidence upon the point before

adopting the conclusion that he has ever deliberately sanctioned so palpable a violation of the constitutional rights of the citizens of the loyal states as the order of the war department, thus construed, would justify and require. Here, and throughout most of the loyal states, we are far removed from the several fields of military operation. All the arts and occupations of peace can be and are pursued with entire security, and all the laws of the state and Union can be administered by the ordinary courts of justice, as freely, as fully, and as efficiently, as in time of profound peace. The execution of the laws of the land has not been resisted by our people. On the contrary, they have responded to the calls of the general government with unexampled unanimity and alacrity, and have offered their blood and their treasure without stint to maintain the authority of constitutional government. They have waited for no conscription, but have sent hundreds of thousands of volunteers into the field to meet, without complaint, all the exposures, all the vicissitudes, and all the dangers of the camp and the battle field. Without waiting for the tax-gatherer, they have voluntarily and freely contributed untold millions to hasten the departure of these volunteers and strengthen the arm of the government established under the constitution of the Union. Is it possible that such orders as those above copied were intended to operate upon such a people, in the loyal states, and place their liberties at the mercy of every military officer, every officer of police, every policeman, and then to suspend the writ of habeas corpus in such a manner as to prevent a judicial inquiry into the question whether the facts of the case would justify an arrest, even under such orders? Can a man, not liable to do military duty, be arrested under such order, and be detained by force in the military service, without the privilege of showing his exemption and procuring his discharge from such illegal restraint? Could it have been intended that military officers of every grade, and policemen of every class, throughout the loyal states, acting upon their own suspicions, or upon any representation which political prejudice, personal malignity, or other motives might suggest, or in the mere wantonness of unusual and arbitrary power, should be authorized to arrest and imprison any citizen, without the possibility of a judicial investigation? Is every official to whom these orders are addressed to determine for himself what shall constitute disloyal practices—a term not known to the law, which has no fixed or reasonably certain definition, and which every arresting officer is left to interpret as his prejudices, his passions, or his interest may incline? And is such interpretation to be subject to no revision, except by a judge advocate at the seat of government, acting upon extrajudicial, if not entirely ex parte testimony, in the absence of the ac-

cused? Such a construction of the order would place the liberty of every citizen at the mercy of these officials, one of whom might conclude that to speak disparagingly of the military ability and military conduct of General McClellan was a disloyal practice, and tended to discourage volunteer enlistments; while another might consider the abuse of McClellan a virtue, and hold the expression of a doubt of the superlative ability of Fremont as a disloyal practice of the deepest dye; and yet another might suppose that any person who should read aloud the newspaper accounts of the retreat of Gen. Pope's army from the Rapidan to the Potomac, and express a doubt as to the competency of that general, was discouraging enlistments and giving aid and comfort to the enemy. I confess, nevertheless, that there is some reason for assuming that the fair construction of the language of the order of the war department, if it could properly be considered without reference to the provisions of the constitution of the United States, would lead us to conclude that the privilege of the writ of habeas corpus was intended to be suspended in all the cases supposed, and I understand such a construction has been sometimes insisted upon; but when I consider that the constitution has imposed restraints upon the arbitrary exercise of military power, (at least beyond the lines of military operations,) I am willing to adopt that construction without strong evidence that such was the intention of the orders referred to. Such a construction of these orders, if their validity can be established, would go far towards making our government a despotic instead of a constitutional government.

Even in the midst of our present struggle, we should not forget the teachings and history of the past, and regard as trivial and unimportant, constitutional principles, the persistent violation of which has led to the dethronement of kings, and the overthrow of long established forms of government. We should not forget the letters du cachet of the French monarchs, or the illegal imprisonments under Charles I. In our efforts to read aright and profit by the terrible lesson which the present condition of our unhappy country presents, we should not forget what Hume, and Hallam, and Blackstone, and Marshall, and Story, and Kent, have taught us. The language of Blackstone (1 Bl. Comm. 134–136) has been often quoted and approved, and it states with accuracy the laws and constitution of England, and the practice of the French monarchy at the time he wrote. This, with the proceedings of the house of commons upon the celebrated petition of rights, shows the importance which the sore experience of the people of England had given the questions involved in the present case. Blackstone says, (volume 1, p. 134:)

"Next to personal security, the law of England regards, asserts, and preserves the per-

sonal liberty of individuals. This personal liberty consists in the power of locomotion, of changing situation, or moving one's person to whatsoever place one's own inclination may direct, without imprisonment or restraint, unless by due course of law. Concerning which we may make the same observation as upon the preceding article, that it is a right strictly natural; that the laws of England have never abridged it without sufficient cause; and that in this kingdom it cannot ever be abridged at the mere discretion of the magistrate, without the explicit permission of the laws. Here, again, the language of the great charter is, that no freeman shall be taken or imprisoned but by the lawful judgment of his equals or by the law of the land. And many subsequent old statutes expressly direct that no man shall be taken and imprisoned by suggestion or petition to the king or his counsel, unless it be by legal indictment, or the process of the common law. By the petition of right (3 Car. I.) it is enacted that no freeman shall be imprisoned or detained without cause shown, to which he may make answer according to law. By 16 Car. I. c. 10, if any person be restrained of his liberty by order or decree of any illegal court, or by command of the king's majesty in person, or by warrant of the council board, or of any of the privy council, he shall, upon demand of his counsel, have a writ of habeas corpus, to bring his body before the court of king's bench or common pleas, who shall determine whether the cause of his commitment shall be just, and thereupon do as to justice shall appertain. And by 31 Car. II. c. 2, commonly called the 'Habeas Corpus Act,' the methods of obtaining this writ were so plainly pointed out and enforced, that so long as this statute remains unimpeached, no subject of England can be long detained in prison, except in cases in which the law requires and justifies such detainer. And lest this act should be evaded by demanding unreasonable bail, or sureties for the prisoner's appearance, it is declared by 1 W. & M. pt. 2, c. 2, that excessive bail ought not to be required.

"Of great importance to the public is the preservation of this personal liberty; for, if once it were left in the power of any, of the highest magistrate, to imprison whomever he or his officers thought proper, (as in France it is daily practiced by the crown) there would soon be an end of all other rights and immunities. Some have thought that unjust attacks, even upon life and property, at the arbitrary will of the magistrate, are less dangerous to the commonwealth than such as are made upon the personal liberty of the subject. To bereave a man of life, or by violence to confiscate his estate, without accusation or trial, would be so gross and notorious an act of despotism, as must at once convey the alarm of tyranny throughout the whole kingdom; but confinement of the person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore a more dangerous engine of arbitrary government. And yet, sometimes when the state is in danger, even this may be a necessary measure. But the happiness of our constitution is, that it is not left to the executive power to determine when the danger of the state is so great as to render this measure expedient; for it is the parliament only, or legislative power, that, whenever it sees proper, can authorize the crown, by suspending the habeas corpus act for a short and limited time, to imprison suspected persons without giving any reasons for so doing, as the senate of Rome was wont to have recourse to a dictator, a magistrate of absolute authority, when they judged the republic in any imminent danger."

Again Blackstone says, (volume 3, pp. 133-135:)

"In a former part of these commentaries, we expatiated at large on the personal liberty of the subject. This was shown to be a natural, inherent right, which could not be surrendered or forfeited, unless by the commission of some great and atrocious crime, and which ought not to be abridged in any case, without the special permission of law,—a doctrine coeval with the first rudiments of the English constitution, and handed down to us from our Saxon ancestors, notwithstanding all their struggles with the Danes, and the violence of the Norman Conquest, asserted afterwards and confirmed by the Conqueror himself and his descendants; and though sometimes a little impaired by the ferocity of the times and the occasional despotisms of jealous and usurping princes, yet established on the firmest basis by the provisions of the Magna Charta, and a long succession of statutes enacted under Edward III. To assert an absolute exemption from imprisonment in all cases, is inconsistent with every idea of law and political society, and in the end would destroy all civil liberty by rendering its protection impossible; but the glory of the English law consists in clearly defining the times, the causes, and the extent, when, wherefore, and to what degree, the imprisonment of the subject may be lawful. This it is which induces the absolute necessity of expressing, upon every commitment, the reason for which it is made, that the court, upon a habeas corpus, may examine into its validity, and, according to the circumstances of the case, may discharge, admit to bail, or remand the prisoner; and yet, early in the reign of Charles I., the court of king's bench, relying upon some arbitrary precedents, (and those, perhaps, misunderstood,) determined that they could not, upon a habeas corpus, either bail or deliver a prisoner, though committed without any cause assigned, in case he was committed by special command of the king, or by the lords of the privy council. This drew on a parliamentary inquiry, and pro-

duced the petition of right, (3 Car. I.,) which recites this illegal judgment, and enacts that no freeman hereafter shall be imprisoned or detained. But when, in the following year, Mr. Selden and others were committed by the lords of the council, in pursuance of his majesty's special command, under a general charge of 'notable contempts and stirring up sedition against the king and government,' the judges delayed for two terms, (including also the long vacation,) to deliver an opinion how far such a charge was bailable. And when at length they agreed it was, they; however, annexed a condition of finding sureties for their good behavior, which still protracted their imprisonment, the chief justice, Sir Nicholas Hyde, at the same time declaring that, 'if they were again remanded for that cause, perhaps the court would not afterwards grant a habeas corpus, being already made acquainted with the cause of their imprisonment.' But this was heard with indignation and astonishment by every lawyer present, according to Mr. Selden's own account of the matter, whose resentment was not cooled at the distance of four and twenty years.

"These pitiful evasions gave rise to the statute (16 Car. I. c. 10, § 8) whereby it is enacted, that if any person be committed by the king himself in person, or by his privy council, or any of the members thereof, he shall have granted to him without delay, upon any pretence whatsoever, a writ of habeas corpus, upon demand or motion made to the court of king's bench or common pleas, who shall thereupon, within three court days after the return is made, examine and determine the legality of such commitment, and do what to justice shall appertain, in delivering, bailing, or remanding such prisoner. Yet, still, in the Case of Jenks, before alluded to, who, in 1676, was committed by the king in council, for a turbulent speech at Guildhall, new shifts and devices were made use of to prevent his enlargement by law, and the chief justice (as well as the chancellor) declined to award a writ of habeas corpus ad subjiciendum, in vacation, though at least he thought proper to award the usual writs ad deliberandum, &c., whereby the prisoner was discharged at the Old Bailey. Other abuses had also crept into daily practice, which had, in some measure, defeated the benefit of this great constitutional remedy. The party imprisoning was at liberty to delay his obedience to the first writ, and might wait till a second and third, called an alia and pluries, were issued, before he produced the party, and many other vexatious shifts were practiced to detain state prisoners in custody. But whoever will attentively consider the English history may observe that the flagrant abuse of any power, by the crown or its ministers, has always been productive of struggles, which either discovers the exercise of that power to be contrary to law, or if legal, restrains it for the future. This was the case in the present instance; the oppression of an obscure individual gave birth to the famous habeas corpus act, (31 Car. II. c. 2,) which is frequently considered as another Magna Charta of the kingdom; and, by consequence and analogy, has also in subsequent times reduced the general method of proceeding on those writs, (though not within the reach of that statute, but issuing merely at the common law,) to the standard of law and liberty."

The complaint contained in the 3d, 4th and 5th articles of the petition of right, referred to by Mr. Justice Blackstone, and to which the reluctant consent of Charles I. was enforced by the British house of commons, (Hume's History of England, c. 51, and copy of petition in note; and see Hall. Const. Hist. c. 7,) related to illegal arrests and imprisonments, and the denial of relief upon habeas corpus. These articles are as follows:

"III. And whereas, also, by the statute called the great charter of the liberties of England, it is declared and enacted, that no freeman may be taken or imprisoned, or be disseized of his freehold or liberties, or his free customs, or be outlawed or exiled, or in any manner destroyed, but by the lawful judgment of his peers, or by the law of the land.

"IV. And in the eighth and twelfth year of the reign of King Edward III. it was declared and enacted, by authority of parliament, that no man of what estate or condition that he be, should be put out of his land or tenements, nor taken nor imprisoned, nor disherited nor put to death, without being brought to answer by due process of law.

"V. Nevertheless, against the tenor of the said statutes and other, the good laws and statutes of your realm to that end provided, divers of your subjects have of late been imprisoned without any cause showed; and when for their deliverance they were brought before justice, by your majesty's writs of habeas corpus, there to undergo and receive as the court should order, and their keepers commanded to certify the cause of their detainer, no cause was certified, but that they were detained by your majesty's special command, signified by the lords of your privy council, and yet were returned back to several prisons, without being charged with any thing to which they might make answer according to the law."

And by the tenth article of this petition of rights it was prayed, among other things, "that no freeman, in any such manner as is before mentioned, be imprisoned or detained," and to this, Charles I., after much delay, and a prior evasive answer, was at last compelled by the house of commons to yield his assent in the customary form, "Let it be law as is desired," and thereby, as Hume says, "give full sanction and authority to the petition." It is true, that he afterwards acted in violation of the rights thus

solemnly recognized; but it is equally true that his head was brought to the block by his oppressed and indignant people.

No further discussion can be necessary to show the importance of the principles involved in this case, or the duty of every judicial officer to construe, with all reasonable strictness, the doubtful language of an executive order capable of being made an instrument of innumerable and gross encroachments upon the liberty of the citizen. There may be some ground for doubt in regard to the true construction of the orders of the war department of August 8, 1862, but I am inclined to think they were not intended to have the operation and effect which it has, as I understand, been contended should be given to them, in accordance with what is alleged to be their true meaning and effect. However that may be, in the view I have felt compelled to take in regard to another question arising in the case, I do not deem it necessary to say more in respect to the proper construction of this order. The question referred to is, whether the privilege of the writ of habeas corpus has been, in any case, legally suspended.

In considering this question, I shall not inquire whether the order under consideration was made, or purports to be made, by or under the authority of the president of the United States. The use of the words, "by direction of the president of the United States," in the first sub-division of the order, and their omission in the second and third sub-divisions, may cast some doubt upon the point, but for the purpose of the present question I shall assume that the first and second orders of the 8th of August, 1862, are in fact and in law the orders of the president of the United States.

Can the president, then, without the authority of congress, suspend the privilege of the writ of habeas corpus? When the counsel for the petitioner, some days since, suggested that he desired to apply for a writ of habeas corpus to bring up the body of the petitioner, I had the impression that congress, at its last session, had passed an act authorizing the president to suspend the writ of habeas corpus, and that he had sanctioned the order of the war department under such authority. If this had been the case, I should have held it to be my duty to refuse a writ, in a case within the scope of the law of congress, and the order of the president; but having, since that suggestion was made, received the acts of the last session, I find that I was mistaken, and that congress has passed no law on this subject. The question of the power of the president to suspend the privilege of habeas corpus, without the authority of congress, is therefore presented in this case, if the order of the war department is deemed to be the order of the president, and to extend to such a case as that now under consideration. The question is one of constitutional law and constitutional construction, and was, I think, generally considered as no longer open to controversy, until it was brought prominently before the public by the Case of Merryman, before the learned and venerable chief justice of the United States. In that case, [Case No. 9,487,] the highest judicial officer in the United States did not hesitate to declare, in respect to the claim that the president had the power to suspend the privilege of the writ of habeas corpus, "that he listened to it with some surprise, for I" (he) "had supposed it to be one of those points of constitutional law upon which there was no difference of opinion, and that it was admitted on all hands that the privilege of the writ could not be suspended, except by the act of congress." The clause upon which the question arises is found in the first article of the constitution of the United States, which treats of congress and its powers, and is in these words: "The privilege of the writ of habeas corpus shall not be suspended, unless when, in cases of rebellion or invasion, the public safety may require it;" and the reasoning of the chief justice in the case referred to, is sufficient, in my judgment, to show that the power of suspension is a legislative and not an executive power, and must be exercised, or its exercise authorized, by congress. But the question does not rest upon the reasoning or authority of the present chief justice. He properly cited the authority of Chief Justice Story, and of the supreme court of the United States, when the chief justice's seat was filled by John Marshall, the ablest constitutional lawyer our country has produced. I can not forbear now to quote that portion of the opinion of the chief justice which refers to the authority of Mr. Justice Story, and the supreme court of the United States. The chief justice says: "But I am not left to form my judgment upon this great question from analogies between the English government and our own, or the commentaries of English jurists, or the decisions of English courts, although upon this subject they are entitled to the highest respect, and are justly held as authoritative by our courts of justice. To guide me to a right conclusion, I have the commentaries on the constitution of the United States, of the late Justice Story, not only one of the most eminent jurists of the age, but for a long time one of the brightest ornaments of the supreme court of the United States, and also the clear and authoritative decision of that court itself, given more than half a century since, and conclusively establishing the principles I have above stated."

Mr. Justice Story, speaking in his commentaries of the habeas corpus clause in the constitution, says: "It is obvious that cases of a peculiar emergency may arise, which may justify, nay, even require, the temporary suspension of any right to the writ. But as it has frequently happened in foreign countries, and even in England, that the

writ has, upon various pretexts and occasions, been suspended, whereby persons apprehended upon suspicion have suffered a long imprisonment, sometimes from design and sometimes because they were forgotten, the right to suspend it is expressly confined to cases of rebellion or invasion, when the public safety may require it,—a very just and wholesome restraint, which cuts down at a blow a fruitful means of oppression, capable of being abused in bad times to the worst of purposes. Hitherto, no suspension of the writ has ever been authorized by congress since the establishment of the constitution. It would seem, as the power is given to congress to suspend the writ of habeas corpus in the cases of rebellion or invasion, that the right to judge whether the exigency had arisen, must exclusively belong to that body." 3 Story, Const. par. 1836. And Chief Justice Marshall, in delivering the opinion of the supreme court in the case of Ex parte Bollman, uses this decisive language in 4 Cranch, [8 U. S.] 95: "It may be worthy of remark that this act, (speaking of the one under which I am proceeding) was passed by the first congress of the United States sitting under a constitution which had declared 'that the privilege of the writ of habeas corpus should not be suspended unless when in cases of rebellion or invasion, the public safety may require it.' Acting under the immediate influence of this injunction, they must have felt, with peculiar force, the obligation of providing efficient means by which this great constitutional privilege should receive life and activity; for if the means be not in existence, the privilege itself would be lost, although no law for its suspension should be enacted. Under the impression of this obligation, they gave to all the courts the power of awarding writs of habeas corpus." And again, on page 101: "If at any time the public safety should require the suspension of the powers vested by this act in the courts of the United States, it is for the legislature to say so. The question depends upon political considerations, on which the legislature is to decide. Until the legislative will be expressed, this court can only see its duty and obey the laws." I can add nothing to these clear and emphatic words of my great predecessor.

In the course of his elaborate and well considered opinion, Mr. Chief Justice Taney states his views at length, and I shall make several extracts from other parts of his opinion to show the manner in which the question came before him, the conclusions to which he arrived, and a portion of the argument by which his views are sustained. He says:

"The case, then, is simply this: A military officer residing in Pennsylvania, issues an order to arrest a citizen of Maryland upon vague and indefinite charges, without any proof, so far as appears. Under this order his house is entered in the night; he is seized as a prisoner, and conveyed to Fort Mc-

Henry, and there kept in close confinement. And when a habeas corpus is served on the commanding officer requiring him to produce the prisoner before a justice of the supreme court, in order that he examine into the legality of the imprisonment, the answer of the officer is, that he is authorized by the president to suspend the writ of habeas corpus at his discretion, and, in the exercise of that discretion, suspends it in this case, and on that ground refuses obedience to the writ. As the case comes before me, therefore, I understand the president not only claims the right to suspend the writ of habeas corpus himself, at his discretion, but to delegate that discretionary power to a military officer, and to leave it to him to determine whether he will or will not obey judicial process that may be served upon him. No official notice has been given to the courts of justice, or to the public, by proclamation or otherwise, that the president claimed this power, and had exercised it in the manner stated in the return. And I certainly listened to it with some surprise, for I had supposed it to be one of those points of constitutional law upon which there was no difference of opinion, and that it was admitted on all hands that the privilege of the writ could not be suspended except by act of congress. When the conspiracy of which Aaron Burr was the head became so formidable, and was so extensively ramified as to justify, in Mr. Jefferson's opinion, the suspension of the writ, he claimed, on his part, no power to suspend it, but communicated his opinion to congress, with all the proofs in his possession, in order that congress might exercise its discretion upon the subject, and determine whether the public safety required it. And in the debate which took place upon the subject, no one suggested that Mr. Jefferson might exercise the power himself, if, in his opinion, the public safety demanded it. Having therefore regarded the question as too plain and too well settled to be open to dispute, if the commanding officer had stated that upon his own responsibility, and in the exercise of his own discretion, he refused obedience to the writ, I should have contented myself with referring to the clause in the constitution, and to the construction it received from every jurist and statesman of that day, when the case of Burr was before them. But being thus officially notified that the privilege of the writ has been suspended under the orders and by the authority of the president, and believing, as I do, that the president has exercised a power which he does not possess under the constitution, a proper respect for the high office he fills requires me to state plainly and fully the grounds of my opinion, in order to show that I have not ventured to question the legality of this act without a careful and deliberate examination of the whole subject.

"The clause in the constitution which authorizes the suspension of the writ of habeas

corpus.is in the ninth section of the first article. This article is devoted to the legislative department of the United States. It begins by providing 'that all legislative powers therein granted shall be vested in a congress of the United States, which shall consist of a senate and a house of representatives;' and after prescribing the manner in which these two branches of the legislative department shall be chosen, it proceeds to enumerate specifically the legislative powers which it thereby grants, and the legislative powers which it expressly prohibits, and at the conclusion of this specification a clause is inserted giving congress the power to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this constitution, in the government of the United States or in any department or office thereof. The power of legislation granted by this latter clause is by its words carefully confined to the specific objects before enumerated. But as this limitation was unavoidably somewhat indefinite, it was deemed necessary to guard more effectually certain great cardinal principles essential to the liberty of the citizen, and to the rights and equality of the states, by denying to congress, in express terms, any power of legislating over them. It was apprehended, it seems, that such legislation might be attempted under the pretext that it was necessary and proper to carry into execution the powers granted, and it was determined that there should be no room for doubt, where rights of such vital importance were concerned, and, accordingly, this clause was immediately followed by an enumeration of certain subjects to which the powers of legislation shall not extend; and the great importance which the framers of the constitution attached to the privilege of the writ of habeas corpus to protect the liberty of the citizen is proved by the fact that its suspension, except in cases of invasion and rebellion, is first in the list of prohibited powers; and even in these cases, the power is denied, and its exercise prohibited, unless the public safety may require it. It is true that, in the cases mentioned, congress is, of necessity, the judge of whether the public safety does or does not require it, and its judgment is conclusive. But the introduction of these words is a standing admonition to the legislative body of the danger of suspending it, and of the extreme caution they should exercise, before they give the government of the United States such power over the liberty of a citizen. It is the second article of the constitution that provides for the organization of the executive department, and enumerates the powers conferred on it, and prescribes its duties. And if the high power over the liberty of the citizen now claimed was intended to be conferred on the president, it would undoubtedly be found in plain words in this article. But there is not a word in it that can furnish the

slightest ground to justify the exercise of the power.

"The article begins by declaring that the executive power shall be vested in a president of the United States of America, to hold his office during the term of four years; and then proceeds to prescribe the mode of election, and to specify, in precise and plain words, the powers delegated to him, and the duties imposed upon him. He is not empowered to arrest any one charged with an offence against the United States, and whom he may, from the evidence before him, believe to be guilty, nor can he authorize any officer, civil or military, to exercise this power, for the fifth article of the amendments to the constitution expressly provides that no person shall be deprived of life, liberty or property, without due process of law—that is, judicial process. And even if the privilege of the writ of habeas corpus was suspended by the act of congress, and a party not subject to the rules and articles of war was afterwards arrested and imprisoned by regular judicial process, he could not be detained in prison or brought to trial before a military tribunal, for the article in the amendments to the constitution, immediately following the one referred to, that is, the sixth article, provides that, in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor; and to have the assistance of counsel for his defence. And the only power, therefore, which the president possesses, where the 'life, liberty or property' of a private citizen is concerned, is the power and duty prescribed in the third section of the second article, which requires 'that he shall take care that the laws be faithfully executed.' With such provisions in the constitution, expressed in language too clear to be misunderstood by any one, I can see no ground, whatever, for supposing that the president, in any emergency, or in any state of things, can authorize the suspension of the privilege of the writ of habeas corpus, or arrest a citizen except in aid of the judicial power. He certainly does not faithfully execute the laws, if he takes upon himself legislative power by suspending the writ of habeas corpus, and the judicial power also, by arresting and imprisoning any person without due process of law. Nor can any argument be drawn from the nature of the sovereignty, or the necessities of the government, for self-defence, in times of tumult and danger. The government of the United States is one of delegated and limited powers. It derives its existence and authority altogether from the constitution, and neither of its branches, executive, legislative, or

judicial, can exercise any of the powers of government beyond those specified and granted; for the tenth article of the amendment to the constitution, in express terms, provides that 'the powers not delegated to the United States by the constitution, and not prohibited by it to the states, are reserved to the states respectively or to the people.'

"While the value set upon this writ of habeas corpus in England has been so great that the removal of the abuses which embarrassed its enjoyment has been looked upon as almost a new grant of liberty to the subject, it is not to be wondered at that the continuance of the writ thus made effective, should have been the object of the most jealous care. Accordingly, no power in England, short of that of parliament, can suspend or authorize the suspension of the writ of habeas corpus. I quote again from Blackstone, (1 Bl. Comm. 136:) 'But the happiness of our constitution is that it is not left to the executive power to determine when the danger of the state is so great as to render this measure expedient. It is the parliament only, or the legislative power, that, whenever it sees proper, can authorize the crown to suspend the habeas corpus for a short and limited time, to imprison suspected persons without giving any reason for so doing.' And if the president of the United States may suspend the writ, then the constitution of the United States has conferred upon him more regal and absolute power over the liberty of citizens than the people of England have thought safe to intrust to the crown, a power which the queen of England cannot exercise at this day, and which could not have been lawfully exercised by the sovereign, even in the reign of Charles I."

The chief justice, in his opinion in the Case of Merryman, [Case No. 9,487,] referred to the action of congress at the time of Burr's conspiracy, in 1807, and to the fact that it was not then claimed that the president had power to suspend the privilege of the writ of habeas corpus. There appears to have been no report of the debate in the senate on the bill there introduced, in consequence of a special message from President Jefferson, (as it was considered in secret session,) but in the house the bill was ably and openly discussed by several members; and though the bill only proposed to suspend the privilege "for three months and no longer," in "all cases where any person or persons charged on oath with treason, misprision of treason, or other high crime or misdemeanor, endangering the peace, safety or neutrality of the United States, have been or shall be arrested and imprisoned by virtue of any warrant or authority of the president of the United States, or from the chief executive magistrate of any state or territorial government, or of any person acting under the direction or authority of the president of the United States," the house, by a vote of 113 to 19, rejected the bill, on the usual motion,

"that the bill be rejected;" which is considered a motion of indignity, indicating that the bill is not worthy of deliberate discussion and consideration in the usual form. Hurd, Hab. Corp. 135.

In the case of Johnson v. Duncan, 3 Mart. (La.) 531, this question was brought under consideration; and, though Chief Justice Martin referred to the decision of the supreme court in the case cited by Chief Justice Taney as exclusive authority, he nevertheless proceeded to examine the question as though it had not been authoritatively decided. The whole opinion is remarkable for its vigor and clearness, and will repay the most careful examination; and I will extract a portion of it which directly relates to the question now under consideration. After referring to the argument that all the functions of the civil magistrate had been suspended by a proclamation of martial law, by the officer commanding the military district, the chief justice proceeded as follows:

"This bold and novel assertion is said to be supported by the ninth section of the first article of the constitution of the United States, in which are detailed the limitations of the powers of the legislature of the Union. It is there provided, 'that the privilege of the writ of habeas corpus shall not be suspended, unless when, in cases of rebellion or invasion, the public safety may require it.' We are told that the commander of the military districts is the person to suspend the writ, and is to do so whenever, in his judgment, the public safety appears to require it; that, as he may thus paralyze the arm of the justice of his country in the most important case,—the protection of the personal liberty of the citizen,—it follows that, as he who can do the more can do the less, he can also suspend all other functions of the civil magistrate, which he does by his proclamation of martial law. This mode of reasoning varies toto caelo from the decision of the supreme court of the United States, in the case of Ex parte Bollman, arrested in this city in 1806, by Gen. Wilkinson. The court there declared that the constitution had exclusively vested in congress the right of suspending the privilege of the writ of habeas corpus, and that body was the sole judge of the necessity that called for suspension. 'If at any time,' said the chief justice, 'the public safety shall require the suspension of the powers vested in the courts of the United States by this act, (the habeas corpus act,) it is for the legislature to say so. This question depends upon political considerations on which the legislature is to decide. Till the legislative will be expressed this court can see only its duties and must obey the law.' 4 Cranch, [8 U. S.] 101. The high authority of this decision seems, however, to be disregarded, and a contrary opinion is said to have been lately acted upon, to the distress and terror of the good people of this state; it is therefore meet to dispel the

clouds which designing men endeavor to cast on this article of the constitution, that the people should know that their rights, thus defined, are neither doubtful nor insecure, but supported on the clearest principles of our laws. Approaching, therefore, the question as if I were without the above conclusive authority, I find it provided by the constitution of this state, that 'no power of suspending the laws of this state shall be exercised unless by the legislature or under its authority.' The proclamation of martial law, therefore, if it intended to suspend the functions of the courts, or its members, is an attempt to exercise powers thus exclusively vested in the legislature. I therefore cannot hesitate in saying that it is in this respect null and void. If, however, there be aught in the constitution or laws of the United States that authorizes the commanding officer of a military district to suspend the laws of this state, as that constitution and these laws are paramount to those of the state, they must regulate the decision of this court. This leads me to the examination of the power of suspending the writ of habeas corpus, and that which it is said to include, of proclaiming martial law, as noticed in the constitution of the United States. As, in the whole article cited, no mention is made of the power of any other branch of government but the legislative, it cannot be said that any of the limitations which it contains extend to any of the other branches. 'Iniquum est perimi de pacto, id de quo cogitatum non est.' If, therefore, this suspending power exist in the executive, (under whose authority it has been endeavored to exercise it,) it exists without any limitation then the president possesses without a limitation of power which the legislature cannot exercise without a limitation. Thus, he possesses a greater power alone than the house of representatives, the senate, and himself jointly. Again, the power of repealing a law, and that of suspending it, (which is a partial repeal,) are legislative powers. For 'eodem modo quo quid constituitur, eodem modo destruitur.' As every legislative power that may be exercised under the constitution of the United States is exclusively vested in congress, all others are retained by the people of the several states.

"In England, at the time of the invasion by the Pretender, assisted by the forces of hostile nations, the habeas corpus act was suspended; but the executive did not thus of itself stretch its own authority. The precaution was deliberated upon and taken up by the representatives of the people. Delolme, 409. And there the power is safely lodged, without the danger of its being abused. Parliament may repeal the law on which the safety of the people depends; but it is not their own caprices and arbitrary humors, but the caprices and arbitrary humors of other men which they will have gratified when they shall thus have over-

thrown the columns of public liberty. Id. 275.

"If it be said that the laws of war, being the laws of the United States, authorize the proclamation of martial law, I answer that in peace or in war no law can be enacted but by the legislative power. In England, from whence the American jurist derives his principles in this respect, 'martial law can not be used without the authority of Parliament.' 5 Com. Dig. 229. The authority of the monarch himself is insufficient. In the case of Grant v. Sir C. Gould, 2 H. Bl. 69, which was on a prohibition (applied for in the court of common pleas) to the defendant, as judge advocate of a court martial, to prevent the execution of a sentence of that military tribunal, the counsel who resisted the motion said it was not to be disputed that martial law can only be exercised in England so far as it is authorized by the mutiny act and articles of war, all which are established by parliament, or its authority, and the court declaring it totally inaccurate to state any other martial law, as having any place whatever within the realm of England."

In the same case, Mr. Justice Derbigny, in delivering his opinion, said:

"To have a correct idea of martial law in a free country, examples must not be sought in the arbitrary conduct of absolute governments. The monarch who unites in his hands all the powers may delegate to his generals an authority unbounded as his own. But in a republic, where the constitution has fixed the extent and limits of every branch of government in time of war, as well as of peace, there can exist nothing vague, uncertain, or arbitrary, in the exercise of any authority.

"The constitution of the United States, in which everything necessary to the general and individual security has been foreseen, does not provide, that in times of public danger the executive power shall reign to the exclusion of all others. It does not trust into the hands of a dictator the reins of the government. The framers of that charter were too well aware of the hazards to which they would have exposed the fate of the republic by such a provision, and had they done it, the states would have rejected a constitution stained with a clause so threatening to their liberties. In the mean time, conscious of the necessity of removing all impediments to the exercise of executive power, in cases of rebellion or invasion, they have permitted congress to suspend the privilege of the writ of habeas corpus in those circumstances, if the public safety should require it. Thus far, and no further, goes the constitution. Congress has not hitherto thought it necessary to authorize that suspension. Should the case ever happen, it is to be supposed it would be accompanied with such restrictions as would prevent any wanton abuse of power. 'In England,' says the author of a justly celebrated work on the constitution of that country, 'at the

time of the invasion of the Pretender, assisted by the forces of hostile nations, the habeas corpus act was indeed suspended; but the executive power did not thus of itself stretch its own authority. The precaution was deliberated upon and taken by the representatives of the people; and the detaining of individuals in consequence of the suspension of the act was limited to a fixed time. Notwithstanding the just fears of internal and hidden enemies, which the circumstances of the times might raise, the deviation from the former course of the law was carried no further than the single point we have mentioned. Persons detained by order of the government were to be dealt with in the same manner as those arrested at the suit of private individuals. The proceedings against them were to be carried on no otherwise than in a public place. They were to be tried by their peers, and have all the usual legal means of defence allowed them, such as calling of witnesses, peremptory challenges of jurors,' &c. And can it be asserted that while British subjects are thus secured against oppression in the worst of times, American citizens are left at the mercy of the will of an individual, who may, in certain cases, the necessity of which is to be judged of by himself, assume a supreme, overbearing, unbounded power! The idea is not only repugnant to the principles of a free government, but subversive of the very foundation of our own.

"Under the constitution and laws of the United States, the president has a right to call, or cause to be called, into the service of the United States, even the whole militia of any part of the Union, in case of invasion. This power, exercised by his delegate, has placed all citizens subject to military duty under military authority and military law. That I conceive to be the extent of the martial law, beyond which all is usurpation of power. In that state of things, the course of judicial proceedings is certainly much shackled, but the judicial authority exists, and ought to be exercised whenever it is practicable. Even where circumstances have made it necessary to suspend the privilege of the writ of habeas corpus, and such suspension has been pronounced by the competent authority, there is no reason why the administration of justice, generally, should be stopped; for, because the citizens are deprived temporarily of the protection of the tribunals as to the safety of their persons, it does by no means follow that they cannot have recourse to them in all other cases. The proclamation of martial law cannot have had any other effect than that of placing under military authority all the citizens subject to military service. It is in that sense alone that the vague expression of martial law ought to be understood among us. To give it any larger extent would be trampling upon the constitution and laws of our country."

That the doctrines of these decisions, in regard to the exercise of the power of suspending the privilege of the habeas corpus, have been almost universally considered as incontrovertible, is fully established by reference to the works of many elementary writers, and by the fact that no evidence of the dissent of other jurists or of the profession has been recorded. Hurd, in his work on Habeas Corpus, in reference to the constitutional provision before referred to, says: "Rebellion and invasion are eminently matters of national concern; and charged, as congress is, with the duty of preserving the United States from both these evils, it is fit that it should possess the power to make effectual such measures as it may deem expedient to adopt for their suppression." Page 133. And, (page 134:) "This power has never been exercised by congress." And, again, (page 149:) "The provision (of the constitution) relating to the writ of habeas corpus limits the legislative power."

Smith, in his Commentaries, also considered this provision of the constitution under the head of "Constitutional Restriction upon Legislative Power." Smith, Comm. c. 8, § 229. And Curtis, in his history of the Constitution, also refers to it as one of the restrictions upon the powers of congress. 2 Curt. Const. p. 359. In Sheppard's Constitutional Text Book, at page 142, this is given as a restriction upon the power of congress. And in the conclusion of the article "Habeas Corpus," in Appleton's New Encyclopedia, it is said: "It has been solemnly decided that the habeas corpus act can be suspended only by the legislature, and that the proclamation of martial law, by a military officer, is not sufficient." The article on martial law, in the same work, contains the following: "The constitution, by implication, also permits its proclamation, by that clause which provides that the privileges of the writ of habeas corpus shall not be suspended," &c. "The right to judge whether the exigency has arisen belongs, it seems, exclusively to congress. So, in England, martial law and its incident, the suspension of the writ of habeas corpus, required the authority of parliamentary acts to give them a constitutional existence."

When the question of the adoption of the federal constitution was under consideration in the Massachusetts convention, the constitutional restriction upon the power of suspending the privilege of the habeas corpus was discussed by Judges Dana and Sumner, in the presence, doubtless, of Nathaniel Gorham and Rufus King, members of that convention, as well as of the one that framed the constitution of the United States, and both the judges evidently regarded it as certain that congress only could suspend the privilege. 2 Elliot, Deb. 108, 109; Hurd, Hab. Corp. 126, 127. And during Shay's Rebellion it was the legislature of Massachusetts, and not her governor, that suspended the privilege of this writ. Hurd, Hab. Corp. 136. Against these authorities, and

the general sentiment of elementary writers, there stands opposed the practice of the war department, first inaugurated in a period of great excitement and alarm, and the official opinion of the learned and venerable gentleman who now holds the office of attorney general of the United States. For that gentleman I entertain the highest respect. His purity of motive and character, his great legal acquirements, and his undoubted patriotism and ability are unquestioned; but, even in these respects, that excellent gentleman would not wish his friend to claim more than that he was the equal of the learned chief justice of the United States. Placing their opinions upon the same footing, they would only neutralize each other, and then the deliberate opinions of Marshall and Story and Martin and the other justices of the supreme court who concurred in the opinion of their chief in the case of Ex parte Bollman, 4 Cranch, [8 U. S.] 75, supported, as they are, in my judgment, by unanswerable argument, are decisive of the question, and constrain me to decide that the president, without the authority of congress, has no constitutional power to suspend the privilege of the writ of habeas corpus in the United States. The prisoner is therefore, in any view which I have been able to take of this case, entitled to the benefit of the writ of habeas corpus, and to be discharged, unless some reason for detaining him, beyond that set out in his petition, is shown. But other reasons besides those set forth in his petition, or in any warrant or order of commitment under which he may be now held, may be shown. The district attorney of the United States will have notice of the allowance of the writ of habeas corpus, and if, on its return, or at any time, he, or the marshal of the United States, or his deputy, or any other citizen, can show that the petitioner has been guilty of any offence against the laws of the United States, or has in any way subjected himself to legal arrest and imprisonment, it will be my duty (a duty which I certainly shall not hesitate to perform) to commit him to prison by a proper and sufficient order or warrant.

I have thus hastily, though with some labor, written out an opinion in this matter, though the application for a habeas corpus was ex parte, and was decided without the benefit of an argument for or against the application. I have done so because the duty of deciding upon the application was a delicate and responsible, as well as an imperative one; and being compelled to decide a question of such importance, under such circumstances, it was but respectful to those high officials, whose legal opinions, opposed to mine, have led to the arrest of the petitioner and the denial of the privilege of the writ of habeas corpus, that I should state, at some length, the reasons for my conclusions and the authority on which I relied. I have preferred, however, even in expressing my own decided opinions, to adopt the deliberate and eloquent language of departed jurists, of world-wide reputation,—language used by them in deciding cases which had been fully argued, and used, too, after they had had the benefit of a full consultation with their learned associates on the bench,—rather than the less forcible and less authoritative language in which I might have expressed my own opinions. The opinions referred to have been before the profession and the country for more than forty years, and, so far as I know, they had not, until a very recent period, been questioned, or their doctrines assailed by any respectable jurist. I cannot but endeavor to follow, though with feeble and uncertain steps, in the paths of constitutional duty, clearly and distinctly marked with the ineffaceable foot-prints of Marshall, of Story, of Washington, of Livingston, of Martin, and of Taney; and, guided by the serene and steady light of their recorded opinions, I may certainly hope not to go far astray.

I have indorsed the proper allowance upon the petition presented, and upon the writ prepared by the clerk.

On motion for attachment against the marshal for disobedience to the writ of habeas corpus, granted as above:

HALL, District Judge. On the 23rd inst., I allowed a writ of habeas corpus, directed to "Edward I. Chase, United States Marshal," commanding him to have the body of Judson D. Benedict, by him imprisoned and detained, as it was said, together with the time and cause of such imprisonment and detention, before me on the 25th inst., at 10 o'clock in the forenoon, at the United States court room, in this city. On the return day of the writ, the counsel for Mr. Benedict furnishes proof of the service of the writ upon Mr. Chase, in this city, about 5 o'clock in the afternoon of the day on which it was issued. The affidavit of Henry B. Ransom, Esq., who made the service, also states that he and the said Chase went together on the same train of cars to Lockport; that he, the deponent, saw, after his arrival there, the said Benedict in front of said Chase's office, in Lockport,—said Chase, as deponent was informed and believed, being in his office at the time. Mr. Chase, the marshal, did not produce Mr. Benedict, the prisoner, on the return day of the writ; nor did he appear in person to make return thereto; but A. G. Stevens, Esq., delivered me the writ, with a statement or return annexed thereto, of which the following is a copy:

"To the Hon. Nathan K. Hall, District Judge of the United States for the Northern District of New York: The annexed writ was delivered to me between five and six o'clock in the afternoon of the 23d day of September inst. Before that time, and about noon of that day, Judson D. Benedict, the person named in that writ, had been arrested

by me for disloyal practice by order of the president of the United States, and put in charge of Daniel G. Tucker, with directions to convey him to the Old Capitol Prison, in the city of Washington, and said Tucker immediately left Buffalo with the prisoner for that purpose. Under general orders made by the president, through the war department, bearing date the 8th day of August, 1862, said Benedict had been, on September 2d, 1862, arrested by my deputy, A. G. Stevens, for such disloyal practice, and said deputy was ordered by the war department to detain him in custody until the further order of said department. For safe keeping, said Benedict was removed from Fort Porter to the jail of Erie county. Afterwards, as is said, a writ of habeas corpus, directed to said Stevens and William F. Best, the jailer, was delivered to said jailer. The war department was informed by said Stevens of the allowance of said writ, and said Stevens was directed by said department not to regard said writ. But said William F. Best, the jailer, refused to allow me or my deputy, Mr. Stevens, to have any control of the prisoner, or of the writ, and avowed his intention to make return to said writ, and produce the prisoner before your honor. I informed the war department of such refusal and avowal. In answer I received an order made by the secretary of war, saying, in substance: 'Your deputy, Mr. Stevens, was directed to disregard the writ of habeas corpus. If Stevens or the jailer permits Benedict to be discharged on habeas corpus, arrest him again, and convey him to the Old Capitol Prison at Washington.' The original order was delivered by me to Mr. Tucker, into whose charge I delivered the prisoner, and I have no perfect copy. The above is a substantial copy, and in all essential particulars is correct. In pursuance of such order, after said Benedict was, on the 23d inst., discharged from the custody of said Best, and said Benedict had left the United States court room, I arrested him, and put him in charge of Mr. Tucker, with the directions above stated. A formidable insurrection and rebellion is, as is well known, now in progress in this country, and the writ of habeas corpus suspended, and the president of the United States, by one of the orders above referred to, made on the 8th of August, declared the same to be suspended in case of disloyal practices. I would refer your honor to the proclamation of the president of the United States of the 24th September inst. I, therefore, understand that the above arrests are military arrests, in relation to which the writ of habeas corpus is suspended. I have, however, out of respect to your honor, and the judicial authority of the country, thought it my duty to return to you the annexed writ of habeas corpus, and make the foregoing statement. Very respectfully, Edward I. Chase, U. S. Marshal. Dated the 25th day of Sept., A. D. 1862."

The counsel for the prisoner objected to the receipt of this statement or return of the marshal, on the ground that it was not sufficient or proper return to the writ; but as it appears to be in the nature of a return, containing a statement of the reasons which had induced the marshal to whom the writ was directed and delivered, to decline obedience to its commands, I can see no sufficient ground upon which to maintain the counsel's objection. The return is therefore received, and forms a part of the record of the proceedings in the case.

The counsel for the prisoner also asked, in substance:

1st. That an order be immediately made discharging the prisoner;

2d. That proceedings by order of attachment be immediately taken for the purpose of punishing the marshal for a contempt in refusing to comply with the requirements of the writ of habeas corpus.

I declined to make an order for the prisoner's discharge, believing that at common law an order for the discharge of a prisoner, for whom a habeas corpus had been issued, could not regularly be made, by a judge at chambers, until the prisoner was produced under the writ. Besides, the prisoner was then, as I supposed, already beyond the limits of my district, and, consequently, where my order of discharge could have no legal operation or effect.

It is true, that I understood the counsel for the prisoner to suggest that he desired an order for the prisoner's discharge, although he was out of my district, for the reason that he supposed that an order of that kind, made by a judicial officer, would be respected and obeyed, even out of his district; but, notwithstanding the apparently serious manner of the counsel, I cannot but regard the suggestion as practically ironical. At all events, it could have no foundation in law or logic, unless it can be logically argued that because a similar order regularly made, while the prisoner was before me, in my own district, and within my conceded jurisdiction, was disregarded and contemned, the order now asked for, irregularly made, while the prisoner was not before me, would be regarded and obeyed, beyond my district and jurisdiction, where it had no legal force, and might, therefore, be properly disregarded.

Having no disposition to go one step beyond the limits of judicial duty, knowing that I should do nothing to bring the judicial department of the government into contempt by overstepping those bounds and making orders which can legally be disregarded, and having (by an examination of a decision of the supreme court of Massachusetts) been confirmed in my impression that I can make no order of discharge until the prisoner is before me, I adhere to the opinion expressed on the return day of the writ, and to the decision then made, denying the order for the discharge of the prisoner, as prayed for

by his counsel. See Hurd, Hab. Corp. 244; Com. v. Chandler, 11 Mass. 83.

I am aware that in this state, and in some others, statutes have been passed authorizing proceedings upon the writ of habeas corpus and the discharge of a prisoner, in certain cases, where he has not been produced; but these proceedings, in exceptional cases, being founded upon special statutes, only serve to show that the general rule is that declared in Massachusetts; and I know of no act of congress which authorized me, under the circumstances of this case, to make the order asked for.

The question whether I shall proceed to punish the marshal for contempt in disobeying the writ of habeas corpus is entirely different in character from that I have just been considering, and also from the questions which were under consideration when the prisoner was before me, some days since, under the former writ of habeas corpus. So long as the question of the prisoner's discharge from custody was before me, every legal presumption was in favor of his right to his liberty; and those who sought to continue his imprisonment were bound to show affirmatively that there was legal authority for his detention. The question now presented is not whether the prisoner shall be discharged from imprisonment, and restored to liberty, but whether the officer who assumed to arrest and hold him shall be deprived of his liberty, and be committed to prison. Upon questions of this character, the right of the marshal and of the prisoner is the same, and each has a right to demand that he shall not be imprisoned or restrained of his liberty without authority of law, and that this right is not peculiar to these parties. It does not result from the clerical character of the one or the official position of the other, for it is the common birth-right of every American citizen, and the marshal and the clergyman but share it equally with the beggar at their gate. It is therefore my duty, before I authorize any restraint upon the liberty of a citizen, to see that I can proceed at every step upon the most solid and stable grounds. And this is more especially the duty of every judicial officer in cases of alleged contempts, because the power of punishment is exercised upon the sole judgment of the court or judge before whom the proceeding is had, without the intervention of a jury; and, ordinarily, (as would be the case in the present instance,) without any right of appeal. It is very certain that no judge who has a just regard to the rights of his fellow citizen can need any suggestion, other than those of his own judicial mind, to convince him that such a power (a power which I have never yet had occasion to exercise during a considerable period of judicial service, in the courts of this state and of the United States) should be exercised with extreme caution, and only after mature deliberation.

After a careful examination of the return made by the marshal, I am satisfied it is clearly insufficient. It does not directly state, and certainly it does not indirectly show, that the prisoner, Benedict, "was not in his (the marshal's) possession, custody, or power at the time of the service of the writ, or at any time after." Hurd, Hab. Corp. 248, etc., and cases there cited. On the contrary, it shows that the prisoner was arrested in pursuance of an order which directed the marshal to arrest him, and to convey him to the old Capitol Prison in Washington; and under such order he must have been in the possession, custody, and power of the marshal when the writ was served and afterwards, as shown by the affidavit of Ransom, annexed to the copy of the writ. There is no statement or pretence that Tucker acted in any other capacity than as deputy or assistant of the marshal, or that any effort was made by the marshal to obey the writ. The return in fact shows that there was no intention to obey the writ, but, on the contrary, that there was, from the first, a settled purpose to disobey it, and to rely upon the action and orders of the war department to justify or excuse such disobedience. The return shows that Benedict was put into the possession of Tucker, (who is officially known to me as a general deputy of the marshal,) for the purpose of conveying him to Washington; and it is fair to presume that the report that Benedict was the next day taken out of the state, on his way to Washington, is not untrue.

I cannot doubt, therefore, that if I had legal power and authority to grant the writ in this case, as I have already decided after mature deliberation, there has been a contempt of the authority of the law, on the part of Marshal Chase, in deliberately refusing obedience to the writ. What is my power, and what is my duty, under the circumstances of this case? is the question which yet remains to be considered. I can make an order requiring a further return; but if such order should be disobeyed, can I, and ought I, to issue and enforce the execution of an attachment for such disobedience? An order for a further return, if obeyed, would not, under the known and conceded facts of this case, produce any results beneficial to the prisoner; and no return in accordance with such facts would show either the command of the writ had been obeyed, or that (in the view I have taken of the case) there is any legal excuse for disobeying it. Indeed, I do not understand that the marshal can properly take any other position than that he has disregarded the writ under the express orders of one of the chief executive departments of the government. The case presents a conflict of opinion between the executive and judicial departments of the government; and the marshal is placed in a position in which he must disregard the authority of one or the other of such departments. He is

an executive officer, and executive officers are ordinarily expected to follow the instructions of their superiors in the executive department; but a marshal is peculiarly situated. He is properly considered as the executive officer of the courts of his district, and is, ordinarily, to obey the orders and execute the process of the judicial department. The act of congress which provides for his appointment, in order to secure obedience to all judicial process, also provides that the marshal, and also his deputies, shall take, before they enter on the duties of their appointment, the following oath of office: "I, A. B., do solemnly swear or affirm, that I will faithfully execute all lawful precepts directed to the marshal of the district of ——, under the authority of the United States, and true returns make; and in all things will well and truly, without malice or partiality, perform the duties of the office of marshal, (or marshal's deputy, as the case may be,) of the district of ——, during my continuance in office, and take only my legal fees. So help me God." While, therefore, the marshal is, in one sense, the officer and agent of the president, to aid him in the discharge of his constitutional duty "to take care that the laws be faithfully executed," he is, in a higher sense, the officer of the constitution and the law, and is bound by his oath of office to carry the process of the law into execution. He is, nevertheless, in the power of the president, for the president can remove a marshal who refuses to execute his orders, and may appoint in his stead a marshal who will execute them. If I am right in my conclusions, the marshal should have obeyed the writ, for that has the authority of law, to which rulers, officers, and people are alike subject; but if I am wrong, and the war department is right, his disobedience is justified. I regard the orders and action of the war department as direct and clear violations of the legal and constitutional rights of the citizen, and that department disregards my judicial opinion and official action as erroneous, unauthorized, and improper. The marshal, placed in a position not of his own choosing, must therefore disobey the orders of the war department, or the command of the writ of habeas corpus, and must, in either event, expose himself to very unpleasant and injurious consequences, even if the writ of habeas corpus has been legally suspended. Such a suspension may prevent the prisoner's discharge; but it leaves untouched the question of the illegality of his arrest, imprisonment, and deportation. If these are unlawful, the marshal and others engaged in these arrests are liable in damages in a civil prosecution; such damages to be assessed by a jury of the country. Besides this civil liability, the parties engaged in making this arrest, and carrying the prisoner out of the state, and beyond the protection of its officers and tribunals, may, perhaps, be subject to criminal punishment.

In the proceedings, civil and criminal, which may be instituted under the laws of the state, the great question involved in this case may be deliberately determined, and they may be taken by writ of error or appeal before the highest judicial tribunals of the state and nation. There is, therefore, no necessity, in order to prevent a failure of justice, that I should exercise the power of proceeding as for a contempt in this case, if there is the slightest doubt of the legality or propriety of such a proceeding. And a subordinate executive officer, placed in the disagreeable position now occupied by the marshal, may properly ask that a single judge, in a proceeding where there is no appeal, shall not punish him for disobeying the orders of the chief executive, especially as the law affords the party aggrieved a full remedy for his arrest, imprisonment, and deportation, if they cannot be legally justified, and has also provided for the punishment of the arresting officer as a criminal, if he has proceeded without authority. As I understand the laws of the state, the marshal can be abundantly punished if he has acted without due authority, without resorting to a proceeding for a contempt; and, even if I did not doubt my legal authority to do so, I should not be inclined to take proceedings for that purpose. Indeed, to be subject for two years to a civil action for such damages as a jury may award the prisoner for his arrest and imprisonment, and also to be subject for years to indictment and trial in any one county from Niagara to New York, inclusive, even if such proceedings were almost certain to result in verdicts in his favor, would be to me, and I have no doubt will be to the marshal, a much severer punishment than I could, under the circumstances of this case, consent to inflict.

In justification of my own course in thus deciding that it is inexpedient, even if I have the power, to proceed against the marshal by attachment, I propose to refer very briefly to the provisions of the statutes of this state, which have influenced me in reaching that conclusion. I also propose to refer to them in this opinion because a general knowledge of these provisions may induce arresting officers, and those who incite them to action, to be more careful to ascertain, before making or causing an arrest, that such arrest can be justified, and for a reason far more important than the interests of those officers, or my own justification, I deem it proper to make such reference in order that I may show that the law has made abundant provision for the redress of the injuries inflicted by illegal arrest and imprisonment, and the illegal removal of the party arrested and imprisoned beyond the jurisdiction of the state courts, for the purpose of repressing any disposition to resist these arrests by violence, instead of relying upon legal proceedings for redress and punishment.

The statutes of the state of New York pro-

vide, in the most ample and effective manner, for the discharge of all persons illegally restrained of their liberty, and they require the courts and judicial officers of the state to allow the writ under a penalty of $1,000, unless it shall appear from the petition therefor, or from the documents annexed, that the party applying for such writ is, by the provisions of the statute, prohibited from prosecuting such writs. And the rule which provides fully for issuing such writs also contains the following sections:

"Sec. 61. Any one having in his custody, or in his power any person, who, by the provisions of this article, would be entitled to a writ of habeas corpus or certiorari, to inquire into the causes of his detention, who shall, with intent to elude the service of any such writ, or to avoid the effect thereof transfer any such prisoner to the custody or place him under the power or control of another, or conceal him, or change the place of his confinement, shall be deemed guilty of a misdemeanor.

"Sec. 62. Any one having in his custody or under his power, any person for whose relief a writ of habeas corpus or certiorari shall have been duly issued, pursuant to the provisions of this article, who with intent to elude the services of such writ, or to avoid the effect thereof, shall transfer such prisoner to the custody or place him under the power or control of another, or conceal him, or change the place of his confinement, shall be deemed guilty of a misdemeanor.

"Sec. 63. Every person who shall knowingly aid or assist in the violation of either of the two last preceding sections shall be deemed guilty of a misdemeanor.

"Sec. 64. Every person convicted of any offence under either of the last four sections, shall be punished by fine or imprisonment, or both, in the discretion of the court in which he shall be convicted, but such fine shall not exceed $1.000, nor such imprisonment six months." 2 Rev. St. pp. 571, 572.

It is further provided by the statutes of this state (Rev. St., 4th Ed., p. 587) as follows:

"Sec. 30. Every person who shall, without lawful authority, forcibly seize and confine any other, or shall inveigle or kidnap any other with intent either—1. To cause such other person to be secretly confined or imprisoned in this state against his will; or, 2. To cause any such person to be sent out of this state against his will; or, 3. To cause such person to be sold as a slave, or in any way held to service against his will, shall, upon conviction, be punished by imprisonment in a state prison not exceeding ten years.

"Sec. 31. Every offence prohibited in the last section may be tried either in the county in which the same may have been committed, or in any county through which any person so kidnapped or confined, shall have been taken, while under such confinement."

And in addition to these provisions of the New York statutes, it must also be remembered that the prisoner has been taken to Washington, and that in December next the questions in regard to the legality of his arrest, imprisonment, and deportation may be inquired into by the highest judicial tribunal of the United States, in his case or that of some other prisoner in like condition. To the decisions of that august tribunal all will cheerfully submit; and, if I am wrong in the view I have taken of the questions involved in the arrest and imprisonment of Benedict, my error will be corrected.

I have already intimated that there was doubt in regard to my power legally to punish the marshal for a contempt in this case, and I propose now to state very briefly the grounds upon which that doubt is based. Process issued by the courts and judicial officers of the United States is issued in the name of the "President of the United States;" and all process authorizing the arrest or commitment of any person is by law and custom directed to the marshal of the district for the execution and return, except in the cases where other provision had been made by the act of congress. In ordinary cases, then, process issued by me in proceedings for a contempt would commence thus: "The President of the United States of America, to the Marshal of the Northern District of New York—Greeting: You are hereby commanded that you take," &c. And thus the process of the law, committing the marshal for a contempt, would run in the name and authority of the president, and would direct the marshal to commit himself to prison. Such a process would surely be practically, and would probably be legally, ineffective for that purpose; and congress has not, so far as I can ascertain, made any provision for authorizing a judge at chambers to issue process in a different form, in a case like that now before me. It is true, the judiciary act provides (section 28) that, "in all cases wherein the marshal or his deputy is a party, the writs and precepts therein shall be directed to such disinterested person as the court or a judge thereof may appoint, and the person so appointed is hereby authorized to execute and return the same," [Act Sept. 24, 1789; 1 Stat. 87;] but this provision appears to extend only to process issued in causes in court. At all events, it is not clearly applicable to such a case as this; and the power of a judge to direct process to an unofficial person, without express authority by statute, is too doubtful to justify me in issuing any such process, or asking any unofficial person (or if any one would undertake the duty) to attempt to execute it. Such a process, in the hands of any party willing to take the risk of its execution, would probably be resisted as unlawful; and a breach of the peace would be the inevitable result of any attempt to execute such process. No judge should do anything tending to such a result where his duty permits him to avoid doing it.

For the reasons I have now given, I shall

decline issuing process against the marshal for his disobedience to the writ of habeas corpus.